O

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

LAREDO DIVISION

| | | |
|---|---|---|
| JOSE GARCIA BRISENO, | § | |
| | § | |
|     Petitioner, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. L-05-08 |
| | § | |
| DOUGLAS DRETKE, | § | |
| TEXAS DEPARTMENT OF CRIMINAL | § | |
| JUSTICE, CORRECTIONAL | § | |
| INSTITUTIONS DIVISION, | § | |
| | § | |
|     Respondent. | § | |

<u>MEMORANDUM AND ORDER</u>

Jose Garcia Briseno ("Briseno"), a Texas inmate convicted of capital murder and sentenced to death, seeks federal habeas relief under 28 U.S.C. § 2254, on the ground that mental retardation prevents his execution.  In <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002), the Supreme Court held that the Constitution exempts mentally retarded offenders from execution.  <u>Atkins</u>, however, left "'to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'"  <u>Atkins</u>, 536 U.S. at 317 (quoting <u>Ford v. Wainwright</u>, 477 U.S. 399, 405 (1986)).  The Texas courts have found that Briseno's mental impairments do not place him in the class of offenders protected by the <u>Atkins</u> decision.  Briseno challenges

both the substantive decision that he is still eligible for execution and the procedure by which the Texas courts made that determination.   After a careful review of the pleadings, the record, and the relevant law – particularly the application of the Anti-Terrorism and Effective Death Penalty Act's ("AEDPA") deferential standards – this Court finds that Briseno's claims do not merit habeas corpus relief for the reasons set forth below.

PROCEDURAL BACKGROUND

This is Briseno's second effort to obtain federal habeas corpus relief.   On appeal from this Court's denial of his initial habeas petition, the Fifth Circuit described the crime that resulted in Briseno's capital murder conviction as follows:

> In late 1990, Ben Murray, the Sheriff of Dimmit County, was investigating a burglary case.   The Sheriff met with Briseno to enlist his help in solving the burglaries. Several weeks later, on Sunday, January 6, 1991, the Sheriff was found dead in his home, with numerous stab wounds and a bullet wound to the head.   At trial, testimony revealed that over five hundred dollars in cash had been taken from the Sheriff. Additionally, two of his pistols were missing.
>
> When Briseno was arrested, he had bandages on both hands. He told police that he had received the cuts in a fight on the previous Friday.   While being held, he attempted to escape with several other inmates, including Ricardo Basaldua. After their capture, Basaldua told authorities of statements Briseno made about the Sheriff's murder. Basaldua testified that on the night of the Sheriff's murder, Briseno and another defendant, Alberto Gonzales,

2

appeared at the Sheriff's home offering to sell some
rings.  Briseno and Gonzales did not have any rings for
sale, but used the ring story to gain entry to the
Sheriff's home.  A struggle began, and they stabbed the
Sheriff.  When Briseno and Gonzales could not take the
Sheriff down, Briseno grabbed the Sheriff's gun off a
table and shot the Sheriff.  Afterwards, Briseno and
Gonzales stole some money from the Sheriff's home and hid
it.  Basaldua also testified that during the escape
Briseno showed him the spot where Briseno had buried the
gun used to kill the Sheriff. Briseno dug up the gun but
soon disposed of it in the same general area before the
police caught the escapees.  Upon being recaptured,
Basaldua led the officers to the location where Briseno
had hidden the gun, and the gun was recovered.

Briseno v. Cockrell, 274 F.3d 204, 205-06 (5th Cir. 2001).

A jury found Briseno guilty of capital murder and answered

Texas' special issue questions in a manner requiring the imposition

of a death sentence.  Texas courts affirmed his conviction and

sentence on state appellate and habeas review.  After Briseno

unsuccessfully sought federal habeas relief, a Texas court set his

execution for July 10, 2002.

On the day of his scheduled execution, Briseno filed a

successive state habeas application alleging that mental

retardation precluded his execution.  The Court of Criminal Appeals

stayed Briseno's execution and remanded his successive application

to the state district court for consideration.  The state district

court held an evidentiary hearing, issued factual findings and

legal conclusions, and recommended that the Court of Criminal

Appeals deny Briseno's successive application.  The Court of Criminal Appeals adopted the lower court findings and, after its own review, denied habeas relief.  Ex parte Briseno, 135 S.W.3d 1 (Tex. Crim. App. 2004).

The state district court again set an execution date for January 20, 2005.  Briseno filed a motion in the Fifth Circuit Court of Appeals requesting permission to file a successive federal habeas petition.  On January 6, 2005, the Fifth Circuit stayed Briseno's impending execution and, pursuant to 28 U.S.C. § 2244(b), found that Briseno made the preliminary showing necessary to file a successive petition in district court.  In re Briseno, No. 04-41650 (5th Cir. Jan. 6, 2005) (unpublished).

On January 18, 2005, Briseno filed his successive habeas petition in this Court.  (Docket Entry No. 1).  Briseno's petition raises two claims: (1) Texas violates the Constitution by not having a jury make the mental retardation determination; and (2) he is mentally retarded as understood by Atkins.  Respondent seeks summary judgment.  (Docket Entry No. 14).

                              DISCUSSION

The state habeas court held an evidentiary hearing in which the parties presented testimony concerning Briseno's intellectual

4

and social limitations.[1]  Both parties affirm the validity of IQ

test scoring that placed Briseno's intellectual capacity near the

threshold for mental retardation.   The parties sharply divide,

however, over how to interpret Briseno's intellectual ability,

particularly on the issue of his capacity for adaptation.   The

parties also disagree about how Texas should determine which

inmates fall within Atkins' protections.   As Briseno raises his

arguments in a successive habeas petition, this Court must first

determine whether  procedural law allows for federal consideration

of Briseno's successive action.

I.   Application of the AEDPA's Threshold Successive Petition

    Requirements to Briseno's Claims

    Federal law erects high barriers to habeas relief,
particularly in the case of petitioners, such as Briseno, who have
already once availed themselves of federal habeas review.  Under 28
U.S.C. § 2244(b)(2)(C), "[t]he court of appeals may authorize the
filing of a second or successive application only if it determines
that the application makes a prima facie showing that the
application satisfies" certain requirements.  The statute allows an

---

[1]

    Briseno's briefing states that he anticipates filing a "motion
for de novo fact-finding, or in the alternative, a new evidentiary
hearing," (Docket Entry No. 1 at 24-25), though he has never filed
such a motion.  The trial-level state court held a full, fair, and
comprehensive hearing into Briseno's alleged mental retardation.
Briseno suggests no new testimony that would exceed the contours of
that already contained in the record.  Assuming that Briseno has
otherwise shown that he meets 28 U.S.C. § 2254(e)(2)'s constraints
on the availability of evidentiary hearings, this Court has "before
it sufficient facts to make an informed decision regarding the
merits of [Briseno's] claim[.]" Murphy v. Johnson, 205 F.3d 809,
816 (5th Cir.), cert. denied, 531 U.S. 957 (2000).  As Briseno does
not demonstrate the necessity of an evidentiary hearing, this Court
proceeds to adjudicate his claims.

inmate to file a successive petition under the following
circumstances:

> (A) the applicant shows that the claim relies on a new
> rule of constitutional law, made retroactive to
> cases on collateral review by the Supreme Court,
> that was previously unavailable; or
>
> (B)(i)  the factual predicate for the claim could not
> have been discovered previously through the
> exercise of due diligence; and
>
>     (ii)  the facts underlying the claim, if proven and
> viewed in light of the evidence as a whole,
> would be sufficient to establish by clear and
> convincing evidence that, but for
> constitutional error, no reasonable factfinder
> would have found the applicant guilty of the
> underlying offense.

28 U.S.C. § 2244(b)(2). A circuit court preliminarily authorizes

the filing of a successive action if a petitioner shows that it is

"reasonably likely" that his successive petition meets section

2244(b)'s "stringent requirements." In re Morris, 328 F.3d 739,

740 (5th Cir. 2003). After the circuit's authorization of a

successive petition, this Court acts as a "second-gatekeeper" and

"conduct[s] a 'thorough' review to determine if the motion

'conclusively' demonstrates that it does not meet AEDPA's second or

successive motion requirements." Reyes-Requena v. United States,

243 F.3d 893, 898-99 (5th Cir. 2001) (quoting United States v.

Villa-Gonzalez, 208 F.3d 1160, 1165 (9th Cir. 2000)); see 28 U.S.C.

§ 2244(b)(4).[2]

Briseno makes no argument that mental health professionals could not have diagnosed his retardation earlier.   In fact, his arguments assume that experts could have diagnosed his retardation well before his eighteenth birthday.   Briseno, therefore, must show that his two claims rely on new, retroactively applicable constitutional law.   See 28 U.S.C. § 2244(b)(2)(A).

### A.   Briseno's Substantive Mental Retardation Claim

Before Atkins, Supreme Court precedent rejected the argument that the Constitution prevented the execution of mentally retarded prisoners.   See Penry v. Lynaugh, 492 U.S. 302, 340 (1989) ("[W]e cannot conclude today that the Eighth Amendment precludes the execution of any mentally retarded person . . . simply by virtue of his or her mental retardation alone.").   The Fifth Circuit has held that Atkins' reversal of the Penry holding represents a new rule of constitutional law that applies retroactively.   See Bell v. Cockrell, 310 F.3d 330, 332 (5th Cir. 2002).   However, invoking

---

[2]   The Fifth Circuit has not explicitly addressed the question of whether the procedural propriety of any one of several claims salvages the entire proposed successive petition.   In practice, the Fifth Circuit requires the district courts to evaluate each claim individually.   This approach complies with the AEDPA's text that requires this Court to "dismiss any *claim* presented in a second or successive application that the court of appeals has authorized to be filed unless the application shows that the claim satisfies" its successive petition standards.   See 28 U.S.C. § 2244(b)(4) (emphasis added).   This Court concludes that it must dismiss any claim raised by Briseno that fails to merit the filing of a successive petition.

Atkins alone does not permit the filing of a successive habeas
petition.  The Fifth Circuit also requires that a petitioner "be
categorized as mentally retarded[.]"  In Re Morris, 328 F.3d at
741.  This "prima facie showing of retardation is 'simply a
sufficient showing of possible merit to warrant a fuller
[exploration] by the district court.'"  In re Hearn, 418 F.3d 444,
445 (5th Cir. 2005) (quoting In re Johnson, 334 F.3d 403, 404 (5th
Cir. 2003)).  While Fifth Circuit law suggests that this Court more
thoroughly review the merits of an Atkins claim before permitting
full review, it has not yet defined the contours of this extra-
statutory review.  This Court assumes that a procedurally adequate
Atkins claim passes through the second gateway when a petitioner
makes more than a prima facie showing of retardation, but without
needing to show entitlement to relief.  This Court will assume that
Briseno meets the Fifth Circuit and AEDPA successive petition
standards in this case.

   B.   Briseno's Challenge to Texas' Procedural Implementation
        of Atkins

   Briseno argues that Texas violated his constitutional rights
by not requiring a jury to decide whether he suffers from mental
retardation.  Recent Supreme Court cases have emphasized that,
"[o]ther than the fact of a prior conviction, any fact that
increases the penalty for a crime beyond the prescribed statutory
maximum must be submitted to a jury, and proved beyond a reasonable

doubt." <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 490 (2000); <u>see also</u>

<u>Ring v. Arizona</u>, 536 U.S. 584, 609 (2002) (extending <u>Apprendi</u> to

Arizona's capital sentencing scheme).   Briseno reasons that, by

placing a substantive limitation on the State's ability to impose

a death sentence, <u>Atkins</u> essentially made freedom from mental

retardation an element of all capital crimes, thereby placing

mental retardation within the purview of <u>Apprendi</u> jurisprudence,

and requiring a jury to decide whether his mental retardation

excludes the death penalty as a sentencing option.

The Fifth Circuit has conclusively decided that the
Constitution does not require a jury to make the mental retardation
determination.   See In Re Johnson, 334 F.3d at 405; <u>see also</u> <u>United</u>
<u>States v. Webster</u>, 421 F.3d 308, 311-12 (5th Cir. 2005) (refusing
to certify an appeal from a 28 U.S.C. § 2255 action based on
<u>Apprendi</u>'s application to <u>Atkins</u> claims); <u>Walker v. True</u>, 399 F.3d
315, 325-26 (4th Cir. 2005).   <u>Apprendi</u> and its progeny provide that

> [i]f a State makes an increase in a defendant's
> authorized punishment contingent on the finding of a
> fact, that fact – no matter how the State labels it –
> must be found by a jury beyond a reasonable doubt.   A
> defendant may not be exposed to a penalty *exceeding the*
> *maximum* he would receive if punished according to the
> facts reflected in the jury verdict alone.

<u>Ring</u>, 536 U.S. at 602 (emphasis added).   Briseno's argument fails

because "the finding of mental retardation does not increase the

penalty for the crime beyond the statutory maximum – death."

<u>Walker</u>, 399 F.3d at 326.   The <u>Atkins</u> inquiry operates instead as a

defense which, like an insanity claim, can only *decrease* a

prisoner's sentence.   <u>In Re Johnson</u>, 334 F.3d at 405.   <u>Atkins</u> does

9

not "render the absence of mental retardation the functional equivalent of an element of capital murder which the state must prove beyond a reasonable doubt." Id. at 405. The Court concludes that Apprendi claim does not warrant the filing of a successive petition.

II. Atkins' Application to Briseno's Mental Retardation Claim

Congress has placed constraints on the availability of habeas relief, including the AEDPA's deferential standard of review. The AEDPA forbids habeas relief on issues adjudicated on the merits in state court unless the state decision "was contrary to, or an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The AEDPA also requires federal deference to state factfindings unless a petitioner presents clear and convincing evidence in rebuttal. See 28 U.S.C. § 2254(e)(1).

The Supreme Court's decision in Atkins v. Virginia that the Eighth Amendment exempts the mentally retarded from execution represents the primary federal law in this case. When the Supreme Court first considered the constitutional implications of executing mentally retarded offenders in Penry, the petitioner in that case argued that an emergent accord among the States showed that his execution would violate the "'evolving standards of decency that

10

mark the progress of a maturing society.'" <u>Penry</u>, 492 U.S. at 334 (quoting <u>Trop v. Dulles</u>, 356 U.S. 86, 101 (1958)). In 1989, however, only two States completely prohibited the execution of retarded offenders. The Supreme Court found the slim support by State legislatures "insufficient evidence of a national consensus against executing mentally retarded people convicted of capital offenses for [the court] to conclude that it is categorically prohibited by the Eighth Amendment." <u>Penry</u>, 492 U.S. at 335.

In <u>Atkins</u>, however, the Court acknowledged the "dramatic shift in the state legislative landscape that ha[d] occurred in the . . . 13 years" after <u>Penry</u>, as several States outlawed the execution of mentally retarded offenders. <u>Atkins</u>, 536 U.S. at 310. Under the Eighth Amendment's "evolving standards of decency" review, the Supreme Court found that our society progressed to the point of refusing to countenance execution of a severely intellectually limited offender. The Supreme Court held that "death is not a suitable punishment for a mentally retarded criminal." <u>Id.</u> at 321. While acknowledging that prevalent societal norms protected the mentally retarded, the Supreme Court left the contours of that new exemption murky. The Court conceded that "[t]o the extent that there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded." <u>Id.</u> at 317. Instead of creating a bright-line

11

test to determine intellectual ineligibility for death, the Supreme Court allocated "'to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" Id. (quoting Ford, 477 U.S. at 405).

Faced with "a significant number of pending habeas corpus applications claiming that the death row inmate suffers from mental retardation and thus is exempt from execution" and "[r]ecognizing that 'justice delayed is justice denied' to the inmate, to the victims and their families, and to society at large," the Texas Court of Criminal Appeals in Ex parte Briseno, 135 S.W.3d 1, 5 (Tex. Crim. App. 2004), "adopted temporary judicial guidelines in addressing Atkins claims." Accordingly, it held that "[u]ntil the Texas legislature provides an alternative definition of 'mental retardation' for use in capital sentencing," Texas courts will adjudicate Atkins claims under the framework established by the American Association on Mental Retardation ("AAMR"), in conjunction with those standards contained in Texas' Persons with Mental Retardation Act ("PMRA"), Tex. Heath & Safety Code Ann. section 591.003(13). Briseno, 135 S.W.3d at 8.

Specifically, Briseno echoed Atkins' reliance on the AAMR

definition of mental retardation,[3] which provides as follows:

> "*Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18."

Atkins, 536 U.S. at 309 n.3 (quoting Mental Retardation:

Definition, Classification, and Systems of Supports 5 (9th ed.

_____

[3]   In addition to the AAMR, the Atkins Court also referenced the American Psychiatric Association's ("APA") definition of mental retardation:

> "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system."

Atkins, 536 U.S. at 309 n.3 (quoting Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000)). The Briseno opinion did not rely on the APA standards. The Court of Criminal Appeals, however, has elsewhere referenced the APA standard. See, e.g., Ex parte Modden, 147 S.W.3d 293, 296 (Tex. Crim. App. 2004) (citing the APA standard). The APA and AAMR standards for mental retardation contain substantially the same criteria for determining mental retardation See Atkins, 536 U.S. at 309 n.3 (noting the similarity between the professional standards).

1992)).[4]  Texas' PMRA, which differs slightly from the AAMR statement, defines mental retardation as "significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period." TEX. HEALTH & SAFETY CODE § 591.003(13).

Taken together, the AAMR and the PMRA contain three indispensable components: (1) significantly subaverage intellectual functioning; (2) limitations in adaptive skill areas; and (3) manifestation of retardation before age 18.  "[A]ll three elements [must] exist to establish mental retardation."  Clark v. Quarterman, 457 F.3d at 441, 444 (5th Cir. 2006); see also In re Salazar, 443 F.3d 430, 432 (5th Cir. 2006) ("To state a successful claim, an applicant must satisfy all three prongs of this test."). A petitioner raising an Atkins claim bears the burden of proof. See United States v. Webster, 421 F.3d 308, 312 (5th Cir. 2005) (finding that the Constitution does not require the State to disprove the existence of mental retardation beyond a reasonable

---

[4]    The Atkins Court relied on the AAMR 9th edition's definition of mental retardation.  In May 2002, the AAMR released a 10th edition that modified its definition of mental retardation: "Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills.  This disability originates before age 18." American Association of Mental Retardation, Mental Retardation: Definition, Classification, and Systems of Support 1 (10th Ed. 2002).  The parties do not point to any material problem with Texas' reliance on the 9th edition definition; this Court will generally use that construct to evaluate Briseno's claim.

doubt); <u>Johnson</u>, 334 F.3d at 405 (same).  The Texas Court of Criminal Appeals followed the nationwide statutory trend of imposing a preponderance-of-the-evidence standard on inmates raising an <u>Atkins</u> claim.  <u>See</u> <u>Briseno</u>, 135 S.W.3d at 12.  Until the Supreme Court or Fifth Circuit officially acknowledges a different burden, this Court will apply <u>Briseno</u>'s preponderance-of-the-evidence standard.

A.  *Subaverage Intellectual Functioning*

Professional organizations and state law recognize a subaverage intellectual functioning component which, while not dispositively proving mental retardation when considered alone, may disentitle an individual to a diagnosis of mental retardation.  The Court of Criminal Appeals found that Briseno did not suffer from impaired intellectual functioning.  Two IQ tests placed Briseno's full scale IQ score at 72 and 74.[5]  "[T]here [is] not much dispute about [Briseno's] IQ level."  <u>Briseno</u>, 135 S.W.3d at 14.  The parties concur that Briseno's IQ scores place him in a borderline area that does not decisively show retardation.  Briseno's attorney conceded the closeness of this case in state court:  "[H]e is pretty much at the highest level that one can have mental

_____

[5]     Earlier testing placed his IQ both below and above 70.  "[B]oth [Briseno's] and the State's experts agreed that the two recent tests most accurately and comprehensively reflected [Briseno's] true IQ."  <u>Briseno</u>, 135 S.W.3d at 14.

15

retardation or – that one can be placed at and still have mental retardation.  He's almost not retarded."  State Habeas Record Vol. 2 at 8-9.  The parties, however, sharply disagree on how to interpret the IQ scores and whether they exclude him from the death penalty.

*IQ Scores Protected by the Atkins Decision*

The Supreme Court in <u>Atkins</u> resisted establishing a bright-line cutoff or universal standard for retardation.  While recognizing that professional organizations diagnose retardation in individuals possessing an IQ of "approximately 70" or "between 70 and 75," the Supreme Court expressly refused to usurp the States' right to determine which inmates are "so impaired as to fall within the range of mentally retarded offenders *about whom there is a national consensus*" against their execution.  <u>Atkins</u>, 536 U.S. at 309, 317 (emphasis added).[4]

The Texas courts have not established 70 as a bright-line standard, but likewise have not expressly adopted a higher score as the upper retardation threshold.  Texas law, like the AAMR, recognizes the subaverage general intellectual functioning

---

[4]   Significantly, <u>Atkins</u> did not distinguish between those who are and are not mentally retarded; rather, <u>Atkins</u> differentiated between those potentially retarded individuals who are so impaired that the Eighth Amendment prohibits their execution and those who, while still possibly classified by some definitions as retarded, are still eligible for execution.

precursor to finding mental retardation.  See TEX. HEALTH & SAFETY CODE § 591.003(13).  Under Texas civil law, "'[s]ubaverage general intellectual functioning' refers to measured intelligence on standardized psychometric instruments of two or more standard deviations below the age-group mean for the tests used." TEX. HEALTH & SAFETY CODE § 591.003(20).  In that respect, the PMRA formulation partially echos the APA's measurement standard.  See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 39 (text rev., 4th ed. 2000) ("DSM-IV") ("[S]ubaverage intellectual functioning is defined as an IQ about 70 or below (approximately 2 standard deviations below the norm).") (emphasis added).  Unlike the clinical standards, however, the Texas statute does not explicitly include an allowance for an IQ score below 70 to serve as a predicate for retardation.

### Reliance on Measurement Error

Briseno makes no argument that his raw IQ scores of 72 and 74 shield him from execution.  Rather, he argues that the possibility of measurement error places his IQ score into that area protected by the Constitution.  Psychology apparently diagnoses mental retardation when IQ scores fall below an approximate score of 70. Professional organizations acknowledge a five point plus-or-minus standard error of measurement, making those with an IQ of 75 potentially eligible for a diagnosis of retardation.  The Clark

17

decision referred to this as the "confidence band."  457 F.3d at 444.  Briseno contends that the Texas courts should have considered his scores of 72 and 74 as if they fell as low as 67, entitling him to an exemption from execution.

In Briseno's case, the Court of Criminal Appeals noted that flexibility exists in professional organizations' interpretation of IQ scoring: "sometimes a person whose IQ has tested above 70 may be diagnosed as mentally retarded while a person whose IQ tests below 70 may not be mentally retarded." Briseno, 135 S.W.3d at 7 n.24. The testimony in the state evidentiary hearing addressed whether that possibility of error allowed for a diagnosis of retardation in Briseno's case.  Briseno's expert Dr. Gilda Kessner, a licenced psychologist, administered the Wechsler Adult Intelligence Scale (hereinafter "WAIS-III") to Briseno.[5]  Dr. Kessner's testing resulted in a verbal scale IQ score of 73, a performance IQ score of 75, and a full scale IQ score of 72.  State Habeas Record Vol. 2 at 31.  Dr. Kessner testified that a 95 percent confidence level applied to the testing, resulting in a five point margin of error.

---

[5]     The WAIS-III is "the standard instrument in the United States for assessing intellectual functioning." Atkins, 536 U.S. at 309 n.5.  The WAIS-III, however, is not the only test.  The Briseno court noted that "IQ tests differ in content and accuracy." Briseno, 135 S.W.3d at 7 n.24.  Accepting the standard error of measurement as creating a bright-line standard of 75, therefore, would institutionalize the WAIS-III as the judicially approved method for testing retardation.

Dr. Kessner testified that this error existed because "the issue of measuring a concept, an entity like intelligence, it's not like measuring a wall, which is concrete."  State Habeas Record Vol. 2 at 36.  Also, Dr. Kessner opined that "factors . . . can come into play to create measurement error" such as fatigue, administration error, and poor testing conditions.  State Habeas Record Vol. 2 at 36-37.  Dr. Kessner explained that "this score of 72, this full-scale of 72, is 95 times out of a hundred.  If you retest him, his score is going to fall within this range.  Or his true score falls within this range of plus or minus five points on either side."  State Habeas Record Vol. 2 at 35.  Dr. Kessner applied the standard error of measurement to find that the lower end of Briseno's IQ range – possibly falling as low as 67 – allowed for a diagnosis of mental retardation.

Recognizing that later testing by the State's expert resulted in a full scale IQ score of 74, Dr. Kessner opined that a "practice effect" possibly caused the slightly higher test score: "in a two-to-twelve week period of retesting, full-scale IQ can be as much as five points higher.  For performance IQ scale practice effects will be minimized after between a year to two years.  So there are still some practice effects."  State Habeas Record Vol. 2 at 44.

19

Briseno's other expert, Dr. Richard Garnett[6] testified after reviewing the WAIS-III testing.  Dr. Garnett testified that Briseno's score of 72 fell within the "professionally accepted range" of significant intellectual impairment.  State Habeas Record Vol. 3 at 20; Vol. 6 at 170.  Dr. Garnett also attributed the slightly higher IQ score resulting from the State's testing to practice effect: "[T]he research shows that when you do these tests or do the WAIS-III, in a test-retest thing the scores tend to go up.  And the scores tend to go up because of, primarily, the practice effect.  And that means you learn from experience."  State Habeas Record Vol. 6 at 174.

Aside from the fact that the practice effect potentially skewed Briseno's scores higher, Dr. Garnett's testimony suggested that measurement error gives researchers a range of scores to consider, without limitation to one direction of emphasis.  Even though the two tests, taken a year apart, yielded similar scores, "[y]ou still have a standard error of measure, because that is the reflection of variation that might occur every time you give the test."  State Habeas Record Vol. 6 at 176.  With respect to

---

[6]     Dr. Garnett is "a frequent expert witness in Texas capital cases who has experience in diagnosing and working with people with mental retardation."  Salazar, 443 F.3d at 433.  Dr. Garnett has wide-ranging expertise in advocating the cause of mentally retarded individuals though his work with legislatures and professional organizations.  Dr. Garnett, however, is not a licenced clinical practitioner in Texas.

Briseno, "So these two test scores, 72 and 74, could very well have been at the top of the range.  They're still within that 65 to 75 [range], and certainly within the criteria that the AAMR and DSM-IV established for that determination, that diagnosis."  State Habeas Record Vol. 6 at 176.

The State's expert Dr. Frederick Mears, a professor of psychology at the University of Texas at Tyler, unequivocally testified that Briseno "is not mentally retarded."  State Habeas Record Vol. 4 at 76, 86.  Dr. Mears opined that his "IQ does not fall" below the standard necessary to show a subaverage general intellectual functioning.  State Habeas Record Vol. 4 at 77.  Dr. Mears testified that Briseno's two IQ scores "were very, very close scores . . . virtually within the standard error of estimate of the retesting."  State Habeas Record Vol. 4 at 79.  Because Briseno's IQ scores only fluctuated two points over a year's time, Dr. Mears opined "that's a pretty good confidence that his score" would actually exist above the threshold of 70.  State Habeas Record Vol. 4 at 83.[7]  According to Dr. Mears, "when you add the confidence intervals [of his two IQ scores], the standard error of estimate

_____

[7]     Dr. Mears admitted that the practice effect could result in higher IQ scores if retesting occurred during a six-week period and that, even a full year later, some practice effect may have influenced portions of the WAIS-III.  State Habeas Record Vol. 4 at 80-81.  However, Dr. Mears opined that previous testing did "not really unduly influence[]" his testing, noting specifically the mere "two points IQ difference."  State Habeas Record Vol. 4 at 81.

gets much closer to the truth." State Habeas Record Vol. 4 at 158. Dr. Mears also emphasized that Briseno's successful adaptive functioning reinforced the decision to place his true IQ score above the threshold for mental retardation. State Habeas Record Vol. 4 at 159-61.

Respondent contends that, due to the close proximity of the two scores taken nearly a year apart, the standard error does not apply and Texas properly found Briseno's IQ to be above the cutoff for mental retardation. Respondent argues that "[a]lthough there is a five point measurement error such that his IQ scores of 72 and 74 could be a low as 67 to 69, the inverse is also true – his score could be as high as 77 to 79, thus placing him clearly outside the range." (Docket Entry 14 at 17). "The fact that his score *could* be the lower end of the range des not automatically require that the court conclude as such." (Docket Entry No. 14 at 17). Briseno, however, maintains that clinical definitions of mental retardation allow an IQ scored as high as 75 to meet the subaverage intellectual functioning prong. Briseno contends that no legal or professional basis exists for ignoring Dr. Garnett's testimony that made his IQ scores eligible for a finding of mental retardation.

The state habeas trial court dismissed any reliance on the standard error of measurement to place Briseno within the category of offenders Atkins protects:

22

> There is measurement error in all testing.  The standard
> error of measurement for the WAIS-III is held to be
> approximately plus or minus 5 points.  The "standard
> error of measurement" represents a confidence interval
> that one may have in a test score.   In this case,
> however, we have a reliable test, separately administered
> by two qualified persons approximately one year apart,
> with quite similar scores, with [Briseno] scoring over 72
> each time.  The scores of the two test[s] thus give great
> confidence that the scores are reliable and accurate.
> The WAIS-III has two other scores (Verbal and Performance
> scores) in addition to the Full Scale Intelligent
> Quotient; these other scores were also quite similar for
> the two different administrations, and none of the scores
> was lower than 72.   The respective Performance scores
> were 76 and 80.  Under these circumstances it would be
> inappropriate to state that [Briseno] has significant
> subaverage general intellectual functioning.

State Habeas Court Findings of Fact and Conclusions of Law

("FFCL"), at 2.   The Court of Criminal Appeals adopted this

resolution after finding "ample evidence in the record" to support

its reasoning.  Briseno, 135 S.W.3d at 14.

The legal definition of "mental retardation" may differ from

the use of that term by the psychological profession.  See Kansas

v. Crane, 534 U.S. 407, 413 (2002) ("[T]he science of psychiatry,

which informs but does not control ultimate legal determinations,

is an ever-advancing science, whose distinctions do not seek

precisely to mirror those of the law.").   The Fifth Circuit in

Clark v. Quarterman, supra, considered whether a court *must* find

subaverage intellectual functioning when a petitioner's IQ scores

fall below 70 only with the application of the measurement error.

23

The Fifth Circuit found that, although the <u>Atkins</u> Court "did refer to the clinical definitions of mental retardation promulgated by the AAMR and the [APA]" which rely on measurement error, "it did not dictate that the approach and the analysis of the State inquiry *must* track the approach of the AAMR or the APA exactly." 457 F.3d at 445. Thus, precise tracking of the AAMR's approach is not "clearly established" federal law.  <u>Id</u>.

Absent a showing that <u>Atkins</u> established an Eighth Amendment prohibition against executing offenders whose IQ scores fall in the low 70s, Briseno fails to show that the state courts did not correctly apply the <u>Atkins</u> precedent. As previously noted, <u>Atkins</u> left the interpretation of its new constitutional protection to the States. See <u>Atkins</u>, 536 U.S. at 317 (quoting <u>Ford</u>, 477 U.S. at 405).[8] Because <u>Atkins</u> did not clearly resolve the question and no

---

[8]     There is no evidence of a national consensus among other States that exempts from execution those whose IQ scores fall below 70 when applying the possibility of measurement error.  The decisions of state legislatures are particularly useful in determining the scope of the Eighth Amendment's protections because "[l]aws enacted by the Nation's legislatures provide the 'clearest and most reliable objective evidence of contemporary values.'" <u>Roper</u> v. <u>Simmons</u>, ___ U.S. ___, 125 S. Ct. 1183, 1207 (2005) (quoting <u>Penry</u> v. <u>Lynaugh</u>, 492 U.S. 302, 331 (1989)).  No consistency currently exists among the States with regard to the cut-off line for mental retardation and the application of any standard error of measurement. Like Texas, several States (Alabama, Mississippi, Montana, New Hampshire, New Jersey, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, and Wyoming) have not yet enacted legislation that codifies the <u>Atkins</u> decision.  Two state legislatures have adopted a statutory scheme that integrates the standard error of measurement in their mental retardation inquiry. <u>See</u> Ariz. Rev. Stat. § 13-703.02(C); Ill. Comp. Stat., ch. 725, § (continued...)

decisive consensus exists among the States, the Texas courts did
not unreasonably apply Atkins with respect to its consideration of
Briseno's IQ score.

The Texas courts acknowledged the constitutional prohibition
against the execution of mentally retarded offenders, reviewed the
relevant psychological principles, and considered their impact in
an Eighth Amendment analysis.  The Texas courts concluded that
Briseno's mental limitations fell outside the protections of the
Eighth Amendment.  Briseno has not shown that the Texas courts were

---

[8]    (...continued)
5/114-15(d).  One State, however, established a statutory scheme
that places a rebuttable presumption of retardation *below* the
standard accepted by professional organizations.  See ARK. CODE ANN.
§ 5-4-618(a)(2) ("There is a rebuttable presumption of mental
retardation when a defendant has an intelligence quotient of
sixty-five (65) or below.").  Many States have responded to Atkins
by adopting a statutory standard that does not include an exact
numerical reference point for the mental retardation threshold,
though often referring to the same two-standard-deviation threshold
as the Texas civil statute.  See CAL. PENAL CODE § 1376(a); COLO. REV.
STAT. § 18-1.3-1101, *et seq.*; CONN. GEN. STAT § 53a-46a(h); FLA. STAT.
§ 921.137; GA. CODE ANN. § 17-7-131(a)(3); IND.CODE § 35-36-9-2; KAN.
STAT. ANN. § 21-4623(b)(3); LA. CODE CRIM. Proc. Art. 905.5.1(H)(1);
MO. REV. STAT. § 565.030.6; NEV. REV. STAT. 174.098(7); N.Y. CRIM. PROC.
LAW § 400.27(12)(e); UTAH CODE ANN. § 77-15a-102; VA. CODE ANN. §
19.2-264.3:1.1(A)  The federal government's death penalty statute
prohibited the execution of retarded offenders well before *Atkins*,
but does not specify a standard by which to gauge mental
retardation.  See 18 U.S.C. § 3596(c) (1994).  Some state courts
that, like Texas, face legislative silence on mental retardation
standards, view 70 as the mental retardation cut-off, serving
either as a bright-line or rebuttable demarcation.  See State v.
Lott, 779 N.E.2d 1011, 1014 (Ohio 2002), cert. dismissed, 538 U.S.
1010 (2003); Murphy v. State, 54 P.3d 556,  568 (Okla. Crim. App.
2002).  Others refuse to place a numerical value on the upper limit
of retardation absent express legislative authorization.  See
Franklin v. Maynard, 588 S.E.2d 604, 605 (S.C. 2003).  In short, no
firm consensus exists as to whether Atkins' protections extend to
those offenders whose IQ scores fall between 70 and 75.

wrong, much less unreasonable, in refusing to find that his scores
fell within an area protected by the <u>Atkins</u> decision. *See* 28
U.S.C. § 2254(d)(1).

### Refusal to Apply Measurement Error

Even assuming that <u>Atkins</u> intended to protect those falling
within the borderline area of potential mental retardation, Briseno
does not show that the Texas courts erred in refusing to skew his
scores below 70 rather than above 75, the unquestioned cut-off for
retardation in the mental health community.[9]  The Texas courts
considered the closeness of his two scores to refute any suggestion
that his true IQ would dip below 70.  Even to the extent that the

---

[9]     While the legal question involving the parameters of the
subaverage intellectual functioning prong commands deference under
28 U.S.C. § 2254(d)(1), the Court reviews the application of
Briseno's facts to the <u>Atkins</u> inquiry under 28 U.S.C. § 2254(d)(2)
for unreasonableness. <u>See</u> <u>Clark</u>, 457 F.3d at 443,  The Supreme
Court has not defined section 2254(d)(2)'s contours with the same
precision as section 2254(d)(1)'s standards.  Some courts have
found that a complete absence of record support for disputed
findings permits relief under section 2254(d)(2). <u>See, e.g.,</u>
<u>Hebert v. Cain</u>, 121 Fed. App'x 43, 47 (5th Cir. 2005), <u>Bui v.</u>
<u>Haley</u>, 321 F.3d 1304, 1315-16 (11th Cir. 2003); <u>Miller v. Dormire</u>,
310 F.3d 600, 603-04 (8th Cir. 2002).  That is not the circumstance
before the Court.  Clearly Dr. Mears' testimony supports the state
court findings.  A petitioner, likewise, cannot succeed on habeas
review by only showing the existence of countervailing record
evidence. <u>See, e.g.,</u> <u>Boyle v. Johnson</u>, 93 F.3d 180, 186-87 (5th
Cir. 1996) (finding in a pre-AEDPA case that disagreement among
experts alone is insufficient to undermine the presumption of
correctness), <u>cert. denied</u>, 519 U.S. 1120 (1997).  In the end, "a
federal court may not second-guess a state court's fact-finding
process unless, after review of the state-court record, it
determines that the state court was not merely wrong, but actually
unreasonable." <u>Taylor v. Maddox</u>, 366 F.3d 992, 999 (9th Cir.),
<u>cert. denied</u>, ___ U.S. ___, 125 S. Ct. 809 (2004).

lower court would consider the possibility of measurement error, it displayed reluctance to skew Briseno's IQ scores in his favor: "The preponderance of the evidence does not show that these test scores over-state the actual intellectual functioning of [Briseno]; the evidence in fact showed that there are good indications that the test scores understated [Briseno's] intellectual functioning." FFCL, at 2.  The Court of Criminal Appeals found that "even if a factfinder applied the statistical standard deviation, there is not enough evidence in this record that proves, by a preponderance of the evidence, that [Briseno's] true IQ is lower than 72-74, rather than higher than 72-74."  Briseno, 135 S.W.3d at 14 n.53.  This fact finding is entitled to presumption of correctness.

Because measurement error could as easily raise a petitioner's scores otherwise falling below 70 above that threshold, federal courts are reluctant to grant habeas relief based on an IQ score falling within the borderline area.  See Clark, 457 F.3d at 446. ("The court was not required to find Clark to be mentally retarded merely because the low end of Clark's confidence band was below 70, just as it would not be required to find that Clark could be executed on the basis that the high end of this band fell above 70.").  Aside from referring to the substantial evidence considered by the state courts, Briseno provides no evidence that would allow this Court to call the state court findings into question.

27

The absence of a significantly subaverage intellectual capacity dooms Briseno's claim, see Clark, 457 F.3d at 444. This Court will briefly consider the remaining mental retardation factors out of an abundance of caution.

B.  Deficits in Adaptive Behavior

A low IQ alone does not conclusively determine an inmate's mental retardation. Clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills[.]" Atkins, 536 U.S. at 318. The Texas courts found that Briseno failed to prove by a preponderance of the evidence that he operates with limitations in his adaptive functioning. Briseno cannot succeed on his federal mental retardation claim unless he shows that the state court decision does not survive examination under the AEDPA's highly deferential standards.

The AAMR's definition of mental retardation requires a showing of limitation in at least two "applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work."[10]  Atkins, 536 U.S. at 309 n.3. Texas' PMRA

_____

[10]  The APA requires showing "significant limitations in adaptive functioning" in two similar categories: "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills,
(continued...)

requires a showing of "deficits in adaptive behavior" and more broadly defines that category as "the effectiveness with or degree to which a person meets the standards of personal independence and social responsibility expected of the person's age and cultural group." TEX. HEATH & SAFETY CODE ANN. section 591.003(1). Because the adaptive behavior analysis is "exceedingly subjective," the Briseno opinion outlined several evidentiary factors to be considered as indicative of mental retardation. Briseno, 135 S.W.3d at 8-9. The Briseno factors roughly approximated Atkins' review of common characteristics shared by the mentally retarded:

> Because of their impairments . . . by definition [mentally retarded individuals] have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

Atkins, 536 U.S. at 318. These "impairments can jeopardize the reliability and fairness of capital proceedings against mentally retarded defendants," possibly rendering them "less able to give meaningful assistance to their counsel and [making them] typically

---

[10]    (...continued)
work, leisure, health, and safety." Atkins, 536 U.S. at 309 n.5.

poor witnesses [because] their demeanor may create an unwarranted impression of lack of remorse for their crimes." Id. at 317-18, 320-21.

The lower state court found that Briseno "show[ed] significant limitations only in the area of functional academics," and then reviewed the evidence showing Briseno's positive adaptive skills. The Court of Criminal Appeal extensively examined the factual background considered by the expert witnesses, summarizing each expert's interpretation of individual events. The Court of Criminal Appeals found that "while there is expert opinion testimony in this record that would support a finding of mental retardation, there is also ample evidence, including expert and lay opinion testimony, as well as written records, to support the trial court's finding that applicant failed to prove that he is mentally retarded." Briseno, 135 S.W.3d at 18.

According to the Court of Criminal Appeals, "what constitutes mental retardation in a particular case varies sharply depending upon who performs the analysis and the methodology used." Briseno, 135 S.W.3d at 13. Here, "[b]oth experts relied upon the same evidence and objective data to support their conclusions, yet the defense expert diagnosed mental retardation while the State's expert found no mental retardation but did find evidence consistent with antisocial personality disorder." Id. Simply, "[t]he defense

30

expert sees the glass half-empty, the State's expert sees the glass half-full." Id. While the lower state habeas court's finding focused only on the positive aspects of Briseno's adaptation, the Court of Criminal Appeals adopted its ultimate finding of fact after scrutinizing the complete evidentiary picture.

The state evidentiary hearing produced a complex and detailed picture of Briseno's life, including a holistic view of his strengths and limitations. The Court of Criminal Appeals extensively chronicled this information, comparing that which showed Briseno's significant limitations with that showing astute adaptive skills. At the risk of unduly lengthening this opinion, the evidence reviewed by the Court of Criminal Appeals included:

> Applicant attended East Elementary School in Carrizo Springs I.S.D. According to one of applicant's cousins, this was a school for "problem children" who disrupted the classroom, but his other cousin testified that it was a school for those who had fallen behind in their work because of illness, truancy, or migrant living. Applicant's records showed that his early school work was entirely unsatisfactory, but that he improved somewhat and, after being retained in "pre-primer," was promoted to the next grade each year thereafter. Both the defense and State experts agreed that applicant's school records reasonably reflected his academic functioning abilities. At the age of thirteen, applicant went to Peoria, Illinois, to live with his mother; however, from age fourteen to eighteen applicant was under the care of Illinois juvenile authorities because of repeated acts of delinquency, including five "runaway" violations, truancy, aggravated battery, and two burglaries. According to Illinois juvenile authorities:
>
> > Joe reports that his running away from home is

not due to an unpleasant home or family life.
Instead, he says he does so because it is
sometimes fun to stay out all night and partly
because of his dislike for school. Joe also
mentioned that sometimes he does not know why
he leaves home, "something just comes into my
head, I run away. The next day I feel sorry."
Joe admits that he has lied many times. He
says he realizes that many times he has
promised people that he would behave and then
would break those promises. Joe feels his
parents love and care about him. Both Mr.
Briseno [applicant's step-father] and Joe feel
that there has not been enough discipline
given at home, yet Joe says his step-dad has a
very bad temper and has on occasion beaten
him. Police reports and school records mention
that Joe has run away because of fear of such
beatings.

According to Illinois juvenile records, applicant had
"slithered" through the Texas school system.  He had a
"high dull normal" or "low average" intelligence, and, at
first, functioned academically at about the fourth grade
level.  After four years in the juvenile facilities, he
was issued an eighth grade diploma.  His behavior and
work performance was "very positive," although he did not
express a desire to continue his education.  He wanted to
be a mechanic and "pump gas."  Both the defense and State
experts pointed to the same juvenile records showing
applicant's responses to a series of assessment questions
as evidence of either poor, or good, reasoning ability.
It is highly significant that in none of these voluminous
records is there any indication from any source that any
person thought applicant might be mentally retarded.
Applicant's records and self-reports show that he began
drinking alcohol at the age of nine and started abusing
other substances, including marijuana, glue, LSD, speed,
and barbiturates before he was 18.  Both the defense and
State experts agreed that applicant's drug use may have
impaired his brain functioning as well as his academic
and social skills progress.

Once he was released from the Illinois juvenile system at
the age of eighteen, applicant returned to Texas.  By the

32

time he was twenty-one, he had been sentenced to the Texas Department of Criminal Justice (TDCJ) for burglarizing a jewelry store with an accomplice and stealing $10,000 worth of rings, brooches and necklaces. Before this, he had been arrested for assault with a knife, a previous burglary of a building, and car theft. He returned to TDCJ shortly after he was released on parole for burglary of a vehicle.  After his second release from TDCJ, he was returned again on a forgery conviction, and then, when he "escaped" during a prison furlough, he committed aggravated assault and was sentenced to more time in prison.  Applicant spent approximately ten out of the fifteen years between his release from Illinois juvenile authorities and the murder of Sheriff Murray in Texas prisons.

To the defense experts, this criminal conduct was not inconsistent with mental retardation because these crimes "were not that hard," and they displayed an impulsivity and lack of successful life skills. To the State's expert, this criminal conduct was consistent with antisocial personality disorder which is typified by problems with finding and keeping a job, with marriage, with law-abiding behavior, with lying, and by reckless disregard for the safety of others.  He stated that applicant's impulsivity was antisocial behavior – striking out against other people.

Four TDCJ officers testified at the Atkins hearing that applicant's behavior seemed "normal" and "appropriate" in prison.  He could understand them and they could understand him.  They saw him reading magazines and filling out commissary forms appropriately.  The former Chief Deputy of Dimmit County testified that he had approximately ten different dealings with applicant and found him to be "intelligent, shrewd, and very cunning." This witness had interrogated applicant before and noted that:

> someone that's mentally retarded . . . it's hard to carry a conversation with them sometimes because they wander a lot. [Applicant] does not wander. He can keep a conversation going and he can stay in sequence.

> Applicant testified briefly at the <u>Atkins</u> hearing and his
> testimony was clear, coherent and responsive.  He denied doing
> some of the activities that the State's lay witnesses had said
> he did while he was awaiting trial on the capital murder
> charge twelve years earlier, such as using the local law
> library, cooking Mexican breakfasts for the prisoners,
> accompanying the jailer and keeping a written tally of the
> jailer's "prisoner count."

<u>Briseno</u>, 135 S.W.3d at 15-18 (footnotes omitted).

It is plausible to conclude that Briseno's social adaptation, like his intellectual functioning, likely placed him in a borderline area where his limitations and strengths combined to defy any easy categorization.  The experts differed as to how to interpret certain events in his life in the context of the AAMR's adaptive skill areas.  For instance, Dr. Garnett viewed Briseno's frequent running away from home as "impulsivity" that indicated retardation, while Dr. Mears viewed this as possibly a manifestation of conduct disorder.  Briseno's experts felt that retardation-induced impulsiveness contributed to his criminal history; the State's expert blamed a conduct disorder for his illegal acts.  Without making any explicit credibility determinations with regard to the experts' opinions, the lower court addressed Briseno's adaptive strengths – using language mirroring the AAMR's adaptive skill areas – without crediting the testimony by his experts showing deficient accommodation.  The lower court, like Dr. Mears, viewed Briseno's glass as half full.

The Court of Criminal Appeals, after reviewing the substantial evidence supporting each parties' position, deferred to the lower court's factual findings.[11]

The parties now marshal evidence from the state proceeding that supports or detracts from the state court's finding that Briseno "does not have significant limitations in adaptive functioning." FFCL, at 3.  In the end, this Court's role on federal habeas review is not to parse through each specific piece of evidence supporting the parties' contentions, making credibility judgments about which position, on the whole, finds greater support in the record.  The deferential review required by the AEDPA prevents such an analysis.  Instead, this Court must determine whether the petitioner, who bears the burden in habeas, shows that the state court's adjudication was unreasonable in light of the factual record.  See 28 U.S.C. § 2254(d).

Briseno does not meet that burden.  Briseno largely does not dispute that he can perform the adaptive behaviors listed in the

---

[11]    Briseno argues that this Court should not defer to the lower habeas court's findings because that court only credited testimony favoring its result, possibly ignoring the countervailing evidence in the record.  The Court of Criminal Appeals reviewed the testimony and inferences that allowed for a diagnosis of mental retardation, but deferred to the lower court's findings and conclusion.  However, it did so only after comprehensively considering "expert opinion testimony in the record that would support a finding of mental retardation[.]" Briseno, 135 S.W.3d at 18.  Nothing suggests that the Court of Criminal Appeals ignored evidence supporting Briseno's Atkins claim.

lower court's factual findings.   (Docket Entry No. 17 at 54). Instead, he emphasizes that Dr. Garnett knew that he could engage in those behaviors yet nonetheless found significant adaptive limitations. Briseno, essentially, challenges the methodology used by the State's expert, arguing that the Texas courts misapplied current clinical standards which examine only an individual's limitations, and apparently ignore adaptive strengths.

Nothing in federal law authorizes habeas relief based on an alleged misapplication of professional psychological standards alone.   Admittedly, clinical methodology in forms the mental retardation review, but the Court of Criminal Appeals correctly understood that the Constitution, not differing opinions by qualified experts, defines the class of those mentally retarded offenders excluded from execution:

> Although experts may offer insightful opinions on the question of whether a particular person meets the psychological diagnostic criteria for mental retardation, the ultimate issue of whether this person is, in fact, mentally retarded for purposes of the Eighth Amendment ban on excessive punishment is one for the finder of fact, based upon all of the evidence and determinations of credibility.

Briseno, 135 S.W.3d at 9. Ultimately the Constitution's standards,

often evidenced through a national consensus, shape the
availability of habeas relief.

The Fifth Circuit has employed a broader, more holistic view
of an individual's abilities than that suggested by Briseno.
Specifically, the Fifth Circuit has found that "evidence of a
strength in a particular area of adaptive functioning necessarily
shows that the defendant does not have a weakness in that
particular area." Clark, 457 F. 3d at 447. In another case, the
Fifth Circuit found that positive life skills and contemporaneous
indicators of adaptive strengths refuted a claim of mental
retardation. See Webster, 421 F.3d at 313 n. 15.[12] Importantly,
the Fifth Circuit in Webster relied on evidence of positive
adaptive skills after the inmate's eighteenth birthday, and
particularly those involving his activities and communication in
prison, to counter the suggestion of adaptive limitations. See id.

A federal court will not find a factual finding unreasonable
if "a reasonable body of evidence supports [the disputed] factual
inference[.]" Garcia v. Dretke, 388 F.3d 496, 504 (5th Cir. 2004).
That the Texas courts could have identified adaptive limitations in

_____

[12]     The Webster case involved an appeal from the denial of a
28 U.S.C. § 2255 motion to vacate or set aside a federal conviction
for capital murder. Statutory law explicitly bans the execution of
the mentally retarded by the federal government. See 18 U.S.C.
§ 3596. Webster, however, relied exclusively on Atkins in
considering the defendant's failure to prove the existence of
mental retardation.

the evidence does not mean that it was unreasonable to find otherwise.  While the record contains support for the opinion of Briseno's expert, the same must be said of the State's expert.  The differing opinions prove that "[p]sychiatry is not . . . an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior and symptoms, [and] on cure and treatment[.]"  Ake v. Oklahoma, 470 U.S. 68, 81 (1985); see also Ford, 477 U.S. at 417 ("The stakes are high, and the 'evidence' will always be imprecise.").  The circumstances of Briseno's life suggest both strengths and weaknesses in his ability to adapt to the world around him.  In light of the weighty record support for the state courts' finding of insufficient adaptive limitations, this Court must defer to that adjudication.  See 28 U.S.C. § 2254(d)(2).

     *C.  Onset Before Age 18*

     As Briseno fails to meet the AEDPA standard with respect to the first two commonly accepted criteria for evaluating mental retardation, he has also failed to show the manifestation of retardation before age eighteen.

SUMMARY

     Briseno presented the state courts with evidence and testimony showing a low IQ and the presence of adaptive limitations.  The

38

State strongly countered with contrary arguments and evidence.  The Court of Criminal Appeals extensively reviewed the testimony and evidence, and seriously considered Briseno's claim.  The evidence shows that Briseno's mental skills exist in a borderline area not yet conclusively falling with the Constitution's Eighth Amendment prohibition against the execution of mentally retarded offenders. Briseno has not shown, under the deferential AEDPA standards, that he "fall[s] within the range of mentally retarded offenders about whom there is a national consensus."  Atkins, 536 U.S. at 317.

## CERTIFICATE OF APPEALABILITY

Briseno has not yet requested that this Court grant him a Certificate of Appealability ("COA"), but this Court can consider the issue *sua sponte*.  See Alexander v. Johnson, 211 F.3d 895, 898 (5th Cir. 2000).  Under the AEDPA, a prisoner cannot seek appellate review from a lower court's judgment without receiving a COA.  See 28 U.S.C. § 2253(c).  A court may only issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

The Supreme Court has explained the standard for evaluating the propriety of granting a COA on claims rejected on their merits as follows:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack, 529 U.S. at 484;

Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003).  On the other hand, a district court that has denied a habeas petition on procedural grounds should issue a COA "when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.  Slack, 529 U.S. at 484; Miller-El, 537 U.S. at 336-38.  A district court may also certify an appeal if "the issues presented were adequate to deserve encouragement to proceed further."  Miller-El, 537 U.S. at 336 (citing Slack, 529 U.S. at 484).

Here, the AEDPA and circuit precedent unquestionably prevent the filing of a successive petition based on Briseno's Apprendi claim.  This Court will not certify an appeal on that claim. However, given the complex factual record and unsettled state of Atkins jurisprudence, Briseno's Atkins arguments deserve encouragement to proceed further.  This Court certifies Briseno's Atkins claim for review by the Fifth Circuit.

CONCLUSION

For the foregoing reasons, the Court concludes that Briseno's claims do not entitle him to federal habeas relief.  The Court GRANTS Respondent's Motion for Summary Judgment, DENIES Briseno's Successive Petition for Writ of Habeas Corpus, and shall dismiss

this case with prejudice.   The Court certifies only Briseno's

<u>Atkins</u> claim for review by the Fifth Circuit.


        DONE at Laredo, Texas, this 29th day of March, 2007.


                              _____
                              George P. Kazen
                              United States District Judge

41